SURDAM (SHARPLEIGH v.). See Case No. 12,711.

SURETTE, In re. See Case No. 3,037.

---

## Case No. 13,629.

### SURGET v. BYERS.

[Hempst. 715.] [1]

Circuit Court, D. Arkansas.    April, 1845.[2]

PLEADING IN EQUITY — EXHIBITS — ANSWER—ADMISSIONS—SPECIFIC PERFORMANCE—FRAUDULENT SALE.

1. Pleadings in equity are viewed without regard to form, and exceptions are never allowed if made under circumstances calculated to effect a surprise on either party.

2. Copies of deeds filed with the bill as exhibits become part of it, and if intended to be objected to, should be done before the hearing.

3. It is a rule of pleading at law, that every material averment not denied is admitted; and that rule would seem to apply à fortiori in equity, where all formal exceptions are discouraged.

[Quoted in Cahoon v. Ring, Case No. 2,292.]

4. Allegations in the bill may be considered as established, whenever the statements in the

answer can, by fair interpretation, be construed into an admission of or acquiescence in the same.

5. Where inadequacy of consideration in a sale, either private or judicial, is so gross as to shock the conscience, it is presumptive evidence of fraud.

6. Courts of equity will refuse a specific performance where the consideration is grossly inadequate, or the contract is oppressive and unconscientious.

7. Where the attorney prepared the writ for the clerk, taxed the costs, prepared the advertisement of the sheriff, directed a large quantity of land to be levied on, and himself became the purchaser at a grossly inadequate consideration: *held*, that the sale was fraudulent and void, and the same was set aside.

8. Facts and circumstances detailed and commented on, and a case of fraud developed.

Bill in chancery [by Francis Surget against William Byers] to set aside a sale of lands.

P. Trapnall and S. H. Hempstead, for complainant.

A. Fowler and A. Pike, for defendant.

DANIEL, Circuit Justice. This is a case, as to which, whatever may be the decision upon it, it cannot be denied that it is striking and singular in many of its features. An outline or sketch of the most prominent of those features present these obvious lineaments or characteristics: 1. The institution of an action at law, by a creditor, for the satisfaction of an alleged (and indeed an undeniable) obligation. 2. The discharge of the debtor upon grounds wholly distinct and apart from any impeachment or satisfaction of that obligation, but upon a proceeding which admits the legality of that obligation, and the right to resort to courts of justice for its enforcement. 3. The adjudication of costs against the creditor, for having resorted to a court for the enforcement of his legal rights, and on account of the discharge of his debtor from an obligation and right of action confessedly legal. 4. The transfer, by means of this claim for costs, to the debtor, or to those deriving title under him (and who, from their position in relation to the proceedings above mentioned, and to the parties to those proceedings, were necessarily cognizant of their existence and nature), of landed property in value of more than seven thousand times the amount of the costs adjudged against the creditor, for having instituted his action upon an obligation which is neither impeached nor satisfied. Such, I repeat, are the characteristics of this cause. That they are unusual and striking, none can for a moment hesitate to admit; nor can it be denied, that in their influence they have been, if not ruinous, most oppressive to the plaintiff at law, who is also the complainant in this suit; so unusual and so oppressive, indeed, as to force upon every one the inquiry, by what stern and unbending rule or principle that influence can be maintained; for it must be by the operation of some rule or principle too firm and inflexible to be shaken

---

[1] [Reported by Samuel H. Hempstead, Esq.]

[2] [Affirmed in 19 How. (60 U. S.) 303.]

by considerations of inequality or hardship, or by any circumstances surrounding the transaction, that results such as have been shown in this cause can be operated by the means employed.

The complainant insists that the pretensions set up by the respondent are void:—1. As being contrived by the respondent for the purposes of circumvention, oppression, and fraud. 2. For the gross inadequacy of consideration and effect produced by the contrivance of the respondent. 3. For the want of competency in the respondent to sell the property of the plaintiff to become the purchaser of it himself. 4. On account of the unreasonableness and excessiveness of the levy, this being an abuse of the process of the court, and an evidence of a fraudulent design, and as calculated to inspire suspicion and to deter purchasers, by reason of that suspicion, and by offering larger amounts of property than many persons were disposed or were able to buy. 5. By proof that the suit at law, on which the judgment for costs was rendered, was instituted without the consent or knowledge of the complainant, and that therefore whatever may have appeared on the face of that suit at law, there can arise hence no bar to the right of the complainant to aver and show, in a court of equity, the true position of the complainant with reference thereto. 6. That the process sued out on the judgment at law was not made out nor issued by the only legal and competent officer, but was made up and calculated and determined by the respondent, and by him delivered to the sheriff, who was ordered by the same party as to what particular property, and to what extent to levy the execution. That the sale by the sheriff was null, and could not divest the title of the complainant, because it is proven by the witnesses examined on the part of the respondent, that the requisites of the law, a compliance with which was necessary to give validity to any sale of lands under execution, was not complied with, but were departed from, with the knowledge and participation of the respondent.

The positions on which the defendant rests his defence are substantially these: 1. The strength of his legal title under the execution and sale above mentioned, which sale he alleges was fair, and not fraudulent; and 2. That sacrifices of land in the same section of the state, similar to that complained of, were usual under execution sales.

Before considering the grounds as above stated, constituting what may be called the merits of this case, it seems proper to advert to some questions which have been raised upon the pleadings. These, it is well known, are viewed with very little regard to form in courts of equity, where exceptions are never allowed if they are made under circumstances calculated to effect a surprise on either party, and might have been made at a different stage of the cause, and consistently with fairness to all. This is a tribunal which addresses itself to the consciences of men, which looks to the substance of things, and acts upon the maxim, "ut res magis valeat quam pereat."

Exception has been taken in this case, for the first time at the hearing, to Exhibits A. and B., purporting to be copies from the records of deeds by which portions of the lands levied upon and sold were conveyed by Stephen and Wm. B. Duncan to the complainant. The objection to these deeds or copies is twofold: first, that they were not regularly admitted to record in the state of Arkansas; and that as the complainant had proffered the production of the originals, if required, he should be strictly held to their production. In answer to the first of these grounds of exception, it may be remarked that these copies were filed with the bill as exhibits, and therefore, in legal intendment, made portions thereof. The same notice, therefore, which was given of other portions of the bill, was given of the character of that part of it which was constituted by these documents. It was the undoubted right of the respondent to except to the whole or to portions of the bill, or to acquiesce in the regularity of its allegations, either by express admission or by necessary implication. It is a rule of pleading in the courts of common law, that every material averment which is not denied will be regarded as admitted. This rule would seem to apply à fortiori before a tribunal which discourages all exceptions of a formal character. The respondent had the power, either by demurrer or plea, or by direct denial in his answer, to object to the structure of the bill, or to the competency of the parts or members thereof; and surely it was his duty to warn the complainant, to enable him to meet such exception, if designed to be insisted upon. But it is contended that, by the rule of pleading in equity, where allegations in a bill are neither confessed nor denied by the answer, the complainant is bound to sustain them by proofs, on the final hearing. This rule, which applies rather to the substance than to the forms of proceeding, is, undoubtedly, true in cases where the respondent states that, with the knowledge possessed by him, he can neither confess nor deny the charges contained in the bill; but entirely untrue wherever the statements in the answer can, by fair interpretation, be construed into an admission of, or acquiescence in, the allegation of material facts.

It is insisted that for an insufficiency in an answer, exception may be taken to it. This is true; and, for a like imperfection in the bill, the like remedy may be resorted to; the rule and the obligation operates equally on complainant and respondent; but it is certain that, with respect to the bill or the answer, the court would not sustain a captious exception, when the pleading disclosed or admitted the real grounds of contest in the

cause. Thus much it has been deemed proper to state with reference to the rules of pleading, which even if they went to the exclusion of these copies, would not, on further examination of the case, materially affect the question on which they are intended to bear. For the answer explicitly admits the interest of the complainant, not merely in the lands patented to him, but in all the lands embraced within this controversy.

Leaving, then, this question, raised upon the pleading, we come back to those matters which enter essentially into the character of the proceedings impeached by the bill; and, on reviewing those proceedings, it might, perhaps, be considered pro hac vice, that mere inadequacy of consideration shall not per se amount to proof of fraud, although the concession. thus broadly stated, would scarcely be reconcilable with the qualification put by the courts, namely, unless such inadequacy be so gross as to shock the conscience, —for this qualification amounts necessarily to an affirmation, that if the inadequacy were of a nature so gross as to shock the conscience. it would per se be evidence of fraud. In another instance the courts of equity have reprobated such gross inadequacy when standing solely and singly as the ground of objection, namely, in refusing for that objection alone to decree a specific performance of an oppressive and unconscientious contract; thus showing that they are not governed by mere legal or technical interpretation, but yield to a certain extent to the moral sense and feelings of mankind, and to that principle so strongly stated by Lord Camden: "that nothing can give life and activity to a court of equity, but honor, integrity, fairness; and that wherever these are wanting a court of equity cannot be incited to action. but neither listens, perceives, nor moves." Again, it is insisted that whatever presumption arising from inadequacy of consideration may be permitted as respects transactions strictly between vendor and vendee, no unfavorable influence from that cause is allowable, with respect to sales made under judicial process. In stating the position thus broadly, there seems to be overlooked the qualification uniformly put by the courts, namely, that such sales are to be fairly made. Certainly the fact that such sales are made under the authority of the law, and by the officers of the law, may justly weaken the presumption arising from great inadequacy; but to say that such inadequacy, connected with other facts or circumstances tending to evince fraud or unfairness, could never be regarded, would be about as rational as an assertion that the process of the law could not possibly be abused, and that the ministers of the law must necessarily be pure and upright. The true, the intrinsic character of proceedings, both in court of law, and in pais, are alike subject to the scrutiny of a court of equity, which will probe and sustain or annul them, according to their real character.

In approaching an inquiry into the conduct of the parties, and into the circumstances surrounding the transactions impeached by the bill, it is deemed proper by the court in limine to advert to certain positions advanced by the counsel for the respondent; to which, as urged by those counsel, this court cannot lend its sanction. Thus it has been insisted, that an attorney, as the representative of his client, has a right to control the judgment rendered in favor of that client, and in so doing frame, and to sue out what final process he pleases; to direct the sheriff both as to the kind and amount of the property to be levied upon; to prepare such advertisements of the property as in his judgment may be deemed effectual; and, at the sale of the property, so prepared by himself, to purchase the whole of that property at any sacrifice of it, however great. To the affirmance of such doctrines, or of any practice in pursuance thereof, this court can never lend its assent. An executor, or administrator, or a trustee, cannot purchase at his own sale. If by the levy either the legal or equitable title to the property levied upon is vested in the judgment creditor, or in his attorney for him, the one or the other becomes a trustee, and in any aspect is bound to perfect fairness; and, therefore, cannot take advantage of untoward circumstances, although they may be induced by his own irregularity, to force a sale to the ruin of the debtor, and for his own profit. If such control of judicial proceedings, and of the officers of the law, can be tolerated, the widest door to fraud and oppression would at once be thrown open, and the most unscrupulous adventurer would be the most successful.

With reference to the judgment at law, and the proceedings under it, it has been insisted that this judgment, having been rendered by a competent court, and still remaining unreversed, neither the validity of the judgment nor the proceedings in virtue thereof can now be questioned. True, with respect to the regularity of that judgment, or with any legal errors in obtaining it, this court does not pretend to take cognizance, or to exercise any appellate jurisdiction for its reversal; and. in any attempt at law to impeach such judgment, it must be regarded as operative. But with any fraudulent conduct of any of the parties, in attempting to avail themselves of that judgment. this court can regularly take cognizance. Such a proceeding is within the legitimate province of courts of equity, and constitutes a most comprehensive ground of their jurisdiction.

With reference to the acts of the respondent, in obtaining and enforcing the judgment at law, those acts have been by his counsel sought to be sustained, upon the ground, that as an attorney for Marsh, he had a right to control the judgment, and to carry it into effect. That right, in this respect, like every other right, is bounded by rules of law and justice, and by a proper regard to the rights

and duties of others. So far as it was proper to enforce the legitimate rights of Marsh, it was unquestionably within the power of his attorney to control and direct them; but he could have no power according to what he may have fancied was legitimate, or what he may have thought judicious and promotive of the interest of his client or himself, to usurp the powers of those officers and functionaries to whom the laws have intrusted its just administration, and preservation of the rights of the citizen. The office of clerk or of sheriff, was never designed to be a mere name, or an engine, or a pretext, to be used at the will of any person. By what authority, then, could this respondent assume the functions of both clerk and sheriff? tax such costs as he deemed proper? seize upon property to any amount? advertise it himself, and ultimately become the purchaser? For, by converting the clerk and sheriff into mere ciphers, and becoming the really efficient actor in all their functions, he substituted himself entirely for these officers, in whom the law invested peculiar powers, and on whom it imposed peculiar responsibilities. By this assumption the respondent at once destroyed or evaded all those checks and securities designed for the protection of all. In justification or in excuse for this assumption, it has been contended in argument, (for the position is not sustained in proof,) that it was rendered necessary by the ignorance of those officers, to whom the duties of clerk and sheriff had been assigned, and had become a common practice among attorneys in the particular section of country where it occurred. If this position must be taken as true, it rather aggravates than extenuates the wrong here complained of, as it shows that by the ignorance or corruption of the officers of the law, the rights of the complainant had been handed over to the mercy of one having a direct interest to invade those rights; and evinces a practice in a profession deemed enlightened and honorable, highly calculated to bring that profession into merited disrepute.

Upon the question of illegality in the sale for want of notice, it has been contended in argument for the respondent that the bill contains no charge with respect to such illegality, and that therefore no proofs as to that point can be admitted. It is undeniably the rule in equity, as well as at law, that the proofs must correspond with the allegations, and that evidence inapplicable or irrelevant to the latter, will be disregarded as immaterial. The bill in this case is less minutely and searchingly drawn, than it might have been on this particular point, yet it is considered as being sufficiently comprehensive and sufficiently specific at the same time to cover this point and to justify proofs in relation thereto. It alleges, as illegal and unwarrantable, the taxing of the costs, the writing of the execution, the sale of the property by the party, the description of the property, and the advertisement or notice of

sale by the respondent, and the proceedings under that notice, all as being unwarranted by law and concocted and carried out in fraud. All these allegations it was competent to the complainant to prove. The answer of Byers, after a general denial of fraud and unfairness, after admitting the taxing of the costs, the writing of the execution, the direction to the sheriff as to the lands to be levied upon, and the preparation of the notice of sale—all by himself—next insists upon the regularity and propriety of all these acts. He then proceeds to aver the performance of every prerequisite of the law as to such sales. These prerequisites he enumerates in detail, and introduces evidence to establish them. He says the sheriff advertised the lands, and advertised them for twenty days, in three most public places in each township; and he introduces the evidence of the sheriff and of other witnesses to prove these averments. But in contravention of these statements are first, the admission of the respondent that he himself prepared the notice, and not the sheriff; and as to the evidence of the sheriff introduced and relied on by the respondent, so far from showing that the requisites of the law were complied with, it establishes the fact that they were violated and disregarded, for the sheriff shows that he took the description of the property and the notice of sale prepared by the respondent, and did not act upon any description or statement prepared by himself; in the next place this answer declares that he never did set up advertisements either in number or locality, as he was bound to do, nor could he swear to the fact. He says it was his practice to set them up in places in which it was convenient for him to do so; and to hand over other notices to persons in whom he had confidence. Here, then, is proof supplied by the respondents, that the law had not been complied with. The acts of an official deputy are regular evidence as acts of his principal, binding on that principal and on all persons falling within the scope of his acts. But it is not perceived how the rights of suitors can be at all dependent upon the unofficial and private confidence of an officer, even when that confidence may not have been misplaced. In this case there is no proof that it has been fulfilled; for no person shows that the notices had in fact been given according to law. The belief of either the sheriff or any other person can have no influence where the law calls for full legal proof.

The objections here stated, cannot be deemed narrow or technical in a case like the present,—a case admitted in the argument to be entitled to no favor either at law or in equity,—a case which presents us one feature of liberality or equality,—a case in which the respondent was and is bound to walk the hair line of legal strictness, and from which, if he trips or deviates never so small a space, he is doomed to fall.

The court has not deemed it proper to express an opinion upon the point raised as to the validity of sales under execution made curia non sedente. That is a point as to which there appears to be a considerable diversity, and as to which there is room for diversity of opinion. Not considering that point necessarily involved as a mere question of law in this case, and as it arises upon the statutes of this state, which have not yet been expounded by the local courts, it has been thought respectful to the latter to leave to them the interpretation of these statutes, on points not unavoidably in the path of this tribunal in the performance of its duty. In one aspect, however, the existence merely of the wide spread impression as to the time and place of making sales, may have a direct bearing on the present case, whether such impression was or was not warranted by the statutes, and that is as the knowledge of such an impression, and its effect upon bidding at sales may be an index to the quo animo, the intention and purposes of the respondent, and may point to him as the artificer or contriver of the entire train and machinery by which the interests of the complainant were sought to be and were in fact sacrificed.

Little weight has been given to the general statements of witnesses that property in the particular section of the state has, when sold under execution, commanded but a very small portion of its real value. The instances referred to are susceptible of explanation on two grounds, either of which would deprive them of influence in this cause. The sales thus mentioned might have been, and until the converse is shown, must be presumed to have been unaccompanied by any circumstances which could affect their validity; or they may have been acquiesced in from inability or indisposition of the victims in those sales to subject them to the test of judicial scrutiny. It may well be presumed that a majority of sufferers by such sacrifices would be persons possessed of slender means of resistance, or they would have brought to light any facts or circumstances, if such really had existed, rather than have submitted to oppression and ruin. And here it must be remarked, as a striking and ominous feature in this cause, that amongst the numerous witnesses examined to establish the difference between the value of property and the proceeds of sales under execution; that to the oft repeated, and as it were, stereotyped interrogatory put to them, nothing is said about the quality of the lands so sacrificed, or about the clearness or defectiveness of the titles, and not one word about the situation or value of the lands embraced in this controversy. By evidence taken on the part of the complainant, it is stated that they were worth from one to five dollars, or from two to three dollars per acre, and, taking a mean valuation between these, giving the estimate of three dollars per acre, the lands at the time of the sale were worth not less than forty thousand dollars, and were purchased by the person who originated and controlled the whole transaction for nine dollars and thirteen cents! An inadequacy so enormous as this, if not when regarded singly, yet when taken in connection with the attendant circumstances, with the agency of the defendant in the transaction, can be declared with sincerity to have shocked the conscience and every sense of right entertained by this court, and caused this transaction to be viewed as a proceeding which cannot be countenanced, without the subversion of every rule of legal or moral equity; caused it to be regarded as tainted with fraud from its inception to its consummation; calls upon this court to declare, as it does declare, the sale and conveyance of the property now claimed by the bill as fraudulent and void, and to decree, as it does hereby decree, that the respondent, by proper assurances, release to the complainant all right, title, interest, and property held or claimed by them in and to the lands purported to be conveyed to them by the deed from the sheriff, referred to in the proceedings in this cause. Decreed accordingly.

RINGO, District Judge, did not sit, having been of counsel in the case.

From this decree the defendant appealed to the supreme court of the United States [which affirmed the decree of the circuit court. 19 How. (60 U. S.) 303].